# 19-3522

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆▬◆

AVISHAI REUVANE, ELISHEVA ARON, CHAYIM KUMER, MA'AYAN ARDSTEIN, a minor, by her father and natural guardian, BRIAN ARDSTEIN, and by her mother and natural guardian, KEREN ARDSTEIN, BRIAN ARDSTEIN, individually, KEREN ARDSTEIN, individually, CHAIM KAPLAN, individually, RIVKA KAPLAN, individually, MARGALIT RAPPEPORT, a minor, by her mother and natural guardian, LAURIE RAPPEPORT, LAURIE RAPPEPORT, individually, DEBORAH CHANA KATZMACHER, CHAYA KATZMACHER, MIKIMI STEINBERG, JARED SAUTER, NECHAMA KUMER, THEODORE GREENBERG, MAURINE GREENBERG, YAIR MOR,

*Plaintiffs-Appellants,*

*(Caption continued on inside cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFFS-APPELLANTS

GARY M. OSEN
ARI UNGAR
MICHAEL RADINE
DINA GIELCHINSKY
AARON A. SCHLANGER
OSEN LLC
2 University Plaza, Suite 402
Hackensack, New Jersey 07601
(201) 265-6400

ROBERT J. TOLCHIN
THE BERKMAN LAW OFFICE, LLC
111 Livingston Street
Brooklyn, New York 11201
(718) 855-3627

*Attorneys for Plaintiffs-Appellants*

YAAKOV LICCI, a minor, by his father and natural guardian ELIHAV LICCI and by his mother and natural guardian YEHUDIT LICCI, ET AL., ELIHAV LICCI, YEHUDIT LICCI, TZVI HIRSH, ARKADY GRAIPEL, TATIANA KREMER, YOSEF ZARONA, TAL SHANI, SHLOMO COHEN, NITZAN GOLDENBERG, RINA DAHAN, RAPHAEL WEISS, AGAT KLEIN, TATIANA KOVLEYOV, VALENTINA DEMESH, RIVKA EPON, JOSEPH MARIA, IMMANUEL PENKER, ESTHER PINTO, SARAH YEFET, SHOSHANA SAPPIR, RAHMI GUHAD GHANAM, a minor, by his father and natural guardian FUAD SHCHIV GHANAM and by his mother and natural guardian SUHA SHCHIV GHANAM, FUAD SHCHIV GHANAM, individually, SUHA SHCHIV GHANAM, individually, NOA ARDSTEIN, a minor, by her father and natural guardian, BRIAN ARDSTEIN, and by her mother and natural guardian, KEREN ARDSTEIN, NETIYA YESHUA ARDSTEIN, a minor, by her father and natural guardian, BRIAN ARDSTEIN, and by her mother and natural guardian, KEREN ARDSTEIN, ARIEL CHAIM ARDSTEIN, a minor, by her father and natural guardian, BRIAN ARDSTEIN, and by her mother and natural guardian, KEREN ARDSTEIN, ORNA MOR, MICHAEL FUCHS, ESQ., MUSHKA KAPLAN, a minor, by her father and natural guardian CHAIM KAPLAN, and by her mother and natural guardian RIVKA KAPLAN, ARYE LEIB KAPLAN, a minor, by his father and natural guardian CHAIM KAPLAN, and by his mother and natural guardian RIVKA KAPLAN, MENACHEM KAPLAN, a minor, by his father and natural guardian CHAIM KAPLAN, and by his mother and natural guardian RIVKA KAPLAN, CHANA KAPLAN, a minor, by her father and natural guardian CHAIM KAPLAN, and by her mother and natural guardian RIVKA KAPLAN, EFRAIM LEIB KAPLAN, a minor, by his father and natural guardian CHAIM KAPLAN and by his mother and natural guardian RIVKA KAPLAN, ROCHELLE SHALMONI, OZ SHALMONI, DAVID OCHAYON, YAAKOV MAIMON, MIMI BITON, MIRIAM JUMA'A, individually, and as Personal Representative of THE ESTATE OF FADYA JUMA'A, and individually, SALAH JUMA'A, individually, and as Personal Representative of TEH ESTATE OF SAMIRA JUMA'A, SAID JUMA'A, individually, and as Personal Representative of THE ESTATE OF SAMIRA JUMA'A, ABD EL-RAHMAN JUMA'A, individually, and as Personal Representative of THE ESTATE OF SAMIRA JUMA'A, RAHMA ABU-SHAHIN, ABDEL GAHNI, individually, and as Personal Representative of THE ESTATE OF SOLTANA JUMA'A, SHADI SALMAN AZZAM, individually, and as the Personal Representative of THE ESTATE OF MANAL CAMAL AZZAM, KANAR SHA'ADI AZZAM, a minor, by his father and natural guardian, SHADI SALMAN AZZAM, ADEN SHA'ADI AZZAM, a minor, by his father and natural guardian, SHADI SALMAN AZZAM, ADINA MACHASSAN DAGESH, ARKADY SPEKTOR, YORI ZOVREV, JACOB KATZMACHER, DANIELLE SAUTER, MYRA MANDEL, YAAKOV ABUTBUL, ABRAHAM NATHAN MOR, a minor, by his father and natural guardian, ZION MOR, and by his mother and natural guardian, REVITAL MOR, BAT ZION MOR, a minor, by his father and natural guardian, ZION MOR, and by her mother and natural guardian, REVITAL MOR, MICHAL MOR, a minor, by her father and natural guardian, ZION MOR, and by her mother and natural guardian, REVITAL MOR, ODED CHANA MOR, a minor, by her father and natural guardian, ZION MOR, and by her mother and natural guardian, REVITAL MOR, ZION MOR, individually, REVITAL MOR, individually, ADHAM MAHANE TARRABASHI, JIHAN KAMUD ASLAN, ZOHARA LOUIE SA'AD, IYAH ZAID GANAM, a minor, by his father and natural guardian ZIAD SHCHIV GHANAM, and by his mother and

natural guardian GOUROV TISIR GHANAM, ZIAD SHCHIV GHANAM, individually, GOUROV TISIR GHANAM, individually, EMILLA SALMAN ASLAN,

*Plaintiffs,*

—against—

LEBANESE CANADIAN BANK, SAL,

*Defendant-Appellee,*

AMERICAN EXPRESS BANK, LTD.,

*Defendant.*

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ..............................................................1

STANDARD OF REVIEW ......................................................................1

STATEMENT OF THE ISSUES.................................................................2

PROCEDURAL HISTORY........................................................................4

STATEMENT OF FACTS .......................................................................10

    Plaintiffs...........................................................................................10

    Defendant.........................................................................................10

    Hezbollah ........................................................................................10

    LCB's Hezbollah Customers ............................................................12

    U.S. Government Actions Against LCB ............................................18

SUMMARY OF THE ARGUMENT ..........................................................20

ARGUMENT .......................................................................................26

I.    The District Court Erroneously Held That the SAC Failed to
    Plausibly Allege That LCB Provided "Funds" to Hezbollah. ..........26

II.   The District Court Erroneously Held That the SAC Failed to
    Plausibly Allege That LCB Knew That Its Customers Were
    Affiliated with Hezbollah. ...............................................................28

    A. The District Court Discounted Prior Second Circuit Precedent....28

    B. The District Court Improperly Applied a Heightened Pleading
       Standard to Plaintiffs' Scienter Allegations...................................31

    C. The District Court Ignored Plausible Inferences Drawn From
       LCB's Conduct After the Attacks. .................................................35

III. The District Court Erroneously Held That the SAC Failed to Plausibly Allege That LCB Was Generally Aware of Its Role in Hezbollah's Criminal Enterprise. ..................................................... 36

IV. Plaintiffs Have Plausibly Alleged That LCB Knowingly Provided Substantial Assistance to Hezbollah. ............................................. 43

V. The District Court Erroneously Required Plaintiffs to Plead That LCB Provided Substantial Assistance to Perpetrate the Rocket Attacks. ...................................................................................... 53

CONCLUSION ......................................................................................... 55

# TABLE OF AUTHORITIES

## Cases

*American Family Mutual Insurance Co. v. Grim*,
440 P.2d 621 (Kan. 1968) ................................................. 41, 42

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................... 1, 2

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ......................................................... 1, 34

*Boim v. Holy Land Found. for Relief and Dev.*,
549 F.3d 685 (7th Cir. 2008) ................................................. 20

*Doe v. Exxon Mobil Corp.*,
654 F.3d 11 (D.C. Cir. 2011) ................................................. 29

*Gill v. Arab Bank, PLC*,
893 F. Supp. 2d 474 (E.D.N.Y. 2012) ...................................... 52

*Goldberg v. UBS AG*,
660 F. Supp. 2d 410 (E.D.N.Y. 2009) ...................................... 52

*Halberstam v. Welch*,
705 F.2d 472 (D.C. Cir. 1983) ..................................... *passim*

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) ............................................ 13, 39, 40, 52

*In re DDAVP Direct Purchaser Antitrust Litig.*,
585 F.3d 677 (2d Cir. 2009) ................................................. 31

*Kaplan v. Central Bank of Islamic Republic of Iran*,
961 F. Supp. 2d 185 (D.D.C. 2013) ......................................... 8

*Kaplan v. Central Bank of Islamic Republic of Iran*,
896 F.3d 501 (D.C. Cir. 2018) ................................................. 9

*Kiobel v. Royal Dutch Petroleum Co.*,
   621 F.3d 111 (2d Cir. 2010) .......................................6, 7, 30

*Kiobel v. Royal Dutch Petroleum Co.*,
   569 U.S. 108 (2013) .................................................6, 7

*Licci v. Am. Exp. Bank Ltd.*,
   704 F. Supp. 2d 403 (S.D.N.Y. 2010) ...................................5

*Licci v. Lebanese Canadian Bank, SAL*,
   20 N.Y.3d 327, 984 N.E.2d 893 (2012) .................................6

*Licci v. Lebanese Canadian Bank, SAL*,
   732 F.3d 161 (2d Cir. 2013) ......................................6, 7, 45

*Licci v. Lebanese Canadian Bank, SAL*,
   834 F.3d 201 (2d Cir. 2016) ...................................*passim*

*Licci v. Lebanese Canadian Bank, SAL*,
   Civ. No. 08-cv-7253-GBD, 2015 WL 13649462
   (S.D.N.Y. Apr. 14, 2015) .............................................7, 8

*Licci v. Lebanese Canadian Bank, SAL*,
   No. 08-cv-7253-GBD, 2018 WL 5090972 (S.D.N.Y. Oct. 3, 2018) .........9

*Licci v. Lebanese Canadian Bank, SAL*,
   672 F.3d 155 (2d Cir. 2012) ..........................................6

*Licci v. Lebanese Canadian Bank, SAL*,
   673 F.3d 50 (2d Cir. 2012) ...........................................6

*Linde v. Arab Bank, PLC*,
   882 F.3d 314 (2d Cir. 2018) ....................................*passim*

*Linde v. Arab Bank, PLC*,
   97 F. Supp. 3d 287 (E.D.N.Y. 2015) ..................................53

*Mastafa v. Chevron Corp.*,
   770 F.3d 170 (2d Cir. 2014) .........................................29

*National Council of Resistance of Iran v. Dep't of State*,
   373 F.3d 152 (D.C. Cir. 2004) .......................................46

*Palin v. New York Times Company,*
940 F.3d 804 (2d Cir. 2019) .......................................... 1, 2, 27

*Presbyterian Church of Sudan v. Talisman Energy, Inc.,*
582 F.3d 244 (2d Cir. 2009) ................................................ 29

*Rice v. Paladin Enterprises, Inc.,*
128 F.3d 233 (4th Cir. 1997) ................................................ 22

*Rosemond v. United States,*
572 U.S. 65 (2014) .............................................................. 23

*Rothstein v. UBS AG,*
708 F.3d 82 (2d Cir. 2013) .................................................. 20

*United States v. El-Mezain,*
664 F.3d 467 (5th Cir. 2011) .......................................... 35, 46

*United States v. Falcone,*
109 F.2d 579 (2d Cir. 1940) ................................................ 21

*United States v. Peoni,*
100 F.2d 401 (2d Cir. 1938) ........................................... 22, 23

## Statutes

1 U.S.C. § 1 ............................................................................ 47

18 U.S.C. § 2331(1) ............................................................... 26

18 U.S.C. § 2333 Statutory Note............................................ 20

18 U.S.C. § 2333(a) ..................................................... 9, 20, 26

18 U.S.C. § 2333(d) ................................................. 9, 20, 23, 47

18 U.S.C. § 2333(d)(2).................................................... *passim*

18 U.S.C. § 2336(a) ................................................................. 8

18 U.S.C. § 2338.................................................................... 1

18 U.S.C. § 2339B.......................................................... 39, 40, 46

28 U.S.C. § 1291 ............................................................. 1

28 U.S.C. § 1331 ............................................................. 1

31 U.S.C. § 5318A ......................................................... 18

Antiterrorism Clarification Act of 2018, Pub. L. 115-253, 132 Stat. 3183 (Oct. 3, 2018) ............................................ 9

Justice Against Sponsors of Terrorism Act, Pub. L. 114-222, 130 Stat. 852 (2016) ................................................ *passim*

N.Y. C.P.L.R. § 302(a)(1) ............................................. 6

## Rules

Fed. R. Civ. P. 12(b)(6) .................................................. 1

Fed. R. Civ. P. 8 .......................................................... 31

## JURISDICTIONAL STATEMENT

The District Court had exclusive jurisdiction over this action under 28 U.S.C. § 1331 and 18 U.S.C. § 2338. It entered final judgment on its grant of Appellee-Defendant Lebanese Canadian Bank SAL's ("LCB") motion to dismiss on November 4, 2019. A-194. Plaintiffs-Appellants ("Plaintiffs") filed a timely notice of appeal on December 4, 2019. A-195. This Court has jurisdiction over this appeal under 28 U.S.C. § 1291.

## STANDARD OF REVIEW

This Court reviews *de novo* the District Court's dismissal for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), accepting all well-pleaded factual allegations in the Complaint as true and drawing all inferences in favor of Plaintiffs. *Palin v. New York Times Company*, 940 F.3d 804, 809 (2d Cir. 2019). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility

that a defendant has acted unlawfully." *Palin*, 940 F.3d at 810 (citing *Iqbal*, 556 U.S. at 678).

## STATEMENT OF THE ISSUES

During the years prior to the Hezbollah[1] rocket attacks in which Plaintiffs were injured between July 12 and August 14, 2006, LCB knowingly provided extensive account, wire transfer and other financial services to Hezbollah, which had been designated by the U.S. Government as a Foreign Terrorist Organization ("FTO") in 1997. The Second Amended Complaint ("SAC") plausibly alleged that LCB knowingly provided substantial assistance to Hezbollah, the "person" within the meaning of 18 U.S.C. § 2333(d)(2) who committed the acts of terrorism that injured Plaintiffs, relying, *inter alia*, on: (1) the U.S. Government designations of several of LCB's Hezbollah account holders; (2) the U.S. Government's determination that LCB was a financial institution of primary money laundering concern due to its involvement with Hezbollah; and (3) U.S. Government allegations in the ensuing civil

---

[1]     The terrorist organization's name is spelled in a variety of ways, including "Hezbollah." For consistency purposes, regardless of how source materials spell the terrorist organization's name, it is spelled "Hezbollah" herein.

forfeiture action commenced against LCB in 2011 describing LCB's prominent place at the center of Hezbollah's narcotics trafficking enterprise. These already plausible allegations were further supported by the sworn declaration of former Israeli intelligence officer Uzi Shaya, A-152-55. *See Licci v. Lebanese Canadian Bank, SAL*, 834 F.3d 201, 207-08, 219 (2d Cir. 2016) ("*Licci VI*") (discussing the Shaya declaration).

Nevertheless, the District Court held that Plaintiffs failed to plausibly allege that LCB (1) provided any funds to Hezbollah; (2) knew that its customers belonged to, or acted on behalf of, Hezbollah; or (3) was "generally aware" that it was playing a role in supporting Hezbollah's criminal enterprise. A-188-91. The issues on appeal are:

1) Whether the District Court failed to apply the correct pleading standard in finding it implausible that "Hezbollah received any [] funds" from LCB's Five Customers,[2] which included U.S.-designated entities found to be part, or acting on behalf, of Hezbollah and a senior Hezbollah leader, where this Court previously held that similarly situated co-plaintiffs had adequately pleaded that "LCB knew that the bank accounts between which it facilitated transfers were *owned and controlled by Shahid, an integral part of Hezbollah*." *Licci VI*, 834 F.3d at 218 (emphasis added).

---

[2] As explained below, Shahid (Martyrs) Foundation (a/k/a Shahid (Martyrs) Organization), Bayt al-Mal, Husayn al-Shami, Wahid Mahmoud Sbeity, and the Yousser Company for Finance and Investment are referred to herein as the "Five Customers."

2)     Whether the District Court failed to apply the correct pleading standard for claims brought under 18 U.S.C. § 2333(d)(2) by finding it implausible that LCB knew of "any affiliations between Hezbollah and the Five Customers" where this Court previously held that similarly situated co-plaintiffs had stated "a claim for aiding and abetting Hezbollah's violation of the law of nations" under the Alien Tort Statute's higher *mens rea* standard. *Licci VI*, 834 F.3d at 219.

3)     Whether the District Court erred in dismissing Plaintiffs' aiding and abetting claims under 18 U.S.C. § 2333(d) because they failed to allege "that Defendant knowingly and intentionally supported Hezbollah in perpetrating the rocket attacks," where neither § 2333(d) nor *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) (incorporated by reference into § 2333(d) as the section's interpretive guide) requires knowledge of, or specific intent to support, the specific tort that ultimately injured Plaintiffs.

4)     Whether the District Court misstated the governing causation standard for claims brought under 18 U.S.C. § 2333(d) by requiring Plaintiffs to allege "that Defendant provided money directly to Hezbollah to carry out the attacks" or "that any funds transferred through the LCB Accounts were, in fact, sent to Hezbollah and then used by Hezbollah to perpetrate the rocket attacks."

## PROCEDURAL HISTORY

The original complaint in this action was filed by U.S. and foreign national plaintiffs against LCB and its New York correspondent bank, American Express Bank ("Amex Bank"), in New York County Supreme Court on July 11, 2008, asserting non-federal claims under Israeli law. *Licci, et al. v. American Express Bank Ltd., et al.*, Index No. 109548/08.

4

Amex Bank removed the action to the District Court for the Southern District of New York on August 15, 2008. *Licci, et al. v. American Express Bank Ltd., et al.*, No. 08-cv-7253-GBD (S.D.N.Y.), ECF No. 1. On January 22, 2009, the First Amended Complaint was filed, asserting claims under the Anti-Terrorism Act, 18 U.S.C. § 2331, *et seq.*, ("ATA") on behalf of the U.S. plaintiffs (Plaintiffs herein), claims under the Alien Tort Statute, 28 U.S.C. § 1350 ("ATS") on behalf of the foreign-national plaintiffs, and various supplemental non-federal causes of action on behalf of all plaintiffs. *Licci*, No. 08-cv-7253, ECF No. 23. Both defendants moved to dismiss for failure to state a claim, and LCB also contested personal jurisdiction. *Id.*, ECF Nos. 29, 34.

On March 31, 2010, the District Court (Daniels, J.) dismissed the action against Amex Bank for failure to state a claim and against LCB for lack of personal jurisdiction, finding that LCB's maintenance and use of a New York correspondent bank account to provide the wire transfer services at issue were too attenuated from the rocket attacks to assert personal jurisdiction. *Licci v. Am. Exp. Bank Ltd.*, 704 F. Supp. 2d 403, 408 (S.D.N.Y. 2010) ("*Licci I*"). On appeal, this Court affirmed the

dismissal of the claims against Amex Bank. *Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155 (2d Cir. 2012).

In a separate opinion addressing the District Court's dismissal of LCB, this Court certified the jurisdictional question to the New York Court of Appeals to the extent it relied on New York law. *Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50 (2d Cir. 2012) ("*Licci II*"). The New York Court of Appeals found that the New York long arm statute, N.Y. C.P.L.R. § 302(a)(1), reached LCB's conduct due to its purposeful availment of New York correspondent accounts to allegedly process transfers on behalf of Hezbollah. *Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327, 960 N.Y.S.2d 695, 984 N.E.2d 893 (2012) ("*Licci III*"). This Court then found that personal jurisdiction over LCB comported with due process protections. *Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 165 (2d Cir. 2013) ("*Licci IV*").

Noting that its remand to the District Court would revive LCB's motion to dismiss for failure to state a claim, this Court instructed the District Court to address how its intervening decision in *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111 (2d Cir. 2010), *aff'd*, 569 U.S. 108 (2013), affected the District Court's subject matter jurisdiction over the

foreign-national plaintiffs' ATS claims. *Licci IV*, 732 F.3d at 174. In *Kiobel*, the Second Circuit held that the ATS does not provide subject matter jurisdiction over civil actions against corporations for violations of customary international law. 621 F.3d at 145. In affirming on other grounds, the Supreme Court held that "the presumption against extraterritoriality applies to claims under the ATS" and that the claim in that case "seeking relief for violations of the law of nations occurring outside the United States [was] barred." 569 U.S. at 124. Even where the claims asserted "touch and concern the territory of the United States," the Supreme Court found that "they must do so with sufficient force to displace the presumption against extraterritorial application." *Id.* at 124-25.

On remand, the District Court held that the foreign-national plaintiffs had sufficiently alleged that LCB's conduct "touched and concerned" the U.S. with sufficient force to displace the presumption against extraterritoriality but found that the foreign-national plaintiffs' allegations had failed to meet the required *mens rea* for accessorial liability. *Licci v. Lebanese Canadian Bank, SAL*, Civ. No. 08-cv-7253-GBD, 2015 WL 13649462, at *4 (S.D.N.Y. Apr. 14, 2015) ("*Licci V*").

The District Court accordingly dismissed the foreign-national plaintiffs' ATS claims. *Id.* at *5. On appeal, this Court rejected much of *Licci V*s analysis, finding that the foreign-national plaintiffs had sufficiently pleaded that LCB had aided and abetted Hezbollah's violation of the law of nations—attempted genocide of the Jewish population of Israel involving the same barrage of rocket attacks in 2006 alleged here—even under the heightened *mens rea* standard for aiding and abetting under the ATS, which, unlike the ATA, requires "purpose rather than knowledge alone." *Licci VI*, 834 F.3d at 212-19 (citations omitted). However, this Court ultimately affirmed *Licci V* because *Kiobel* "immunizes corporations from liability" under the ATS. *Id.* at 219-20.

In the same opinion in which it dismissed the foreign-national plaintiffs' ATS claims, the District Court also concluded that the ATA Plaintiffs were collaterally estopped from challenging a finding by a district court in *Kaplan v. Central Bank of Islamic Republic of Iran*, 961 F. Supp. 2d 185 (D.D.C. 2013) that held that their injuries were caused "by reason of an act of war" and were therefore not actionable under the ATA pursuant to 18 U.S.C. § 2336(a). *Licci V*, 2015 WL 13649462, at *3,

*aff'd in part*, *Licci v. Lebanese Canadian Bank*, 659 F. App'x 13 (2d Cir. 2016), *cert. denied*, 138 S. Ct. 1691 (2018).

The D.C. Circuit later reversed *Kaplan* in 896 F.3d 501 (D.C. Cir. 2018), and Congress subsequently clarified that the act of war exception does not apply to attacks carried out by FTOs. *See* Antiterrorism Clarification Act of 2018, Pub. L. 115-253, § 2, 132 Stat. 3183 (Oct. 3, 2018). Accordingly, the District Court granted Plaintiffs' motion for vacatur on the same day. *Licci v. Lebanese Canadian Bank, SAL*, No. 08-cv-7253-GBD, 2018 WL 5090972 (S.D.N.Y. Oct. 3, 2018).

Following that vacatur, the District Court granted the U.S.-national Plaintiffs' request for leave to file the SAC, *Licci, et al. v. American Express Bank Ltd., et al.*, Civ. No. 08-7253-GBD (S.D.N.Y.), ECF No. 96, which they did on December 5, 2018. A-38-68. The SAC asserted primary and secondary liability claims under the ATA, 18 U.S.C. §§ 2333(a) and 2333(d), respectively. On September 20, 2019, the District Court granted LCB's motion to dismiss the SAC. A-177-92. Final judgment was entered on November 4, 2019. A-194. Plaintiffs timely appealed the dismissal of their claims and seek reversal of the dismissal of their aiding and abetting claims under § 2333(d). A-195.

<u>**STATEMENT OF FACTS**</u>

<u>**Plaintiffs**</u>

Plaintiffs are United States citizens who were injured in rocket attacks Hezbollah committed against civilians in Israel between July 12 and August 14, 2006. A-39, ¶ 4.

<u>**Defendant**</u>

Defendant LCB is a Lebanese banking corporation (in liquidation) headquartered in Beirut, Lebanon. A-39, ¶ 5. After the U.S. Government identified LCB as a "financial institution of primary money laundering concern" and commenced a civil forfeiture action against the bank in 2011, LCB ceased its operations in the United States. Verified Amended Complaint, *United States v. Lebanese Canadian Bank, SAL, et al.*, No. 11-cv-9186 (S.D.N.Y. filed Oct. 26, 2012) ("VAC"), A-73-75, ¶¶ 6-7.

<u>**Hezbollah**</u>

Hezbollah was established in Lebanon in 1982. It is a radical Islamic terrorist organization which views the State of Israel, the United States and other Western countries as its enemies. A-39-40, ¶¶ 5, 8. From its founding through July 2006, Hezbollah perpetrated hundreds of terrorist attacks, including against American targets, killing hundreds of U.S. citizens and injuring hundreds more. A-39-40, ¶¶ 5-14. Hezbollah's

policy and practice of perpetrating terrorist attacks was known to LCB between 1988 and July 2006, because Hezbollah operates openly in Lebanon (where it is a major political and military force) and has publicly and repeatedly acknowledged having such a policy and perpetrating such attacks. A-41, ¶¶ 15-16. As noted above, the U.S. Government designated Hezbollah an FTO in 1997. A-43, ¶ 19. That designation has remained in place through the present. *Id.*

Because Hezbollah is a designated FTO, it is subject to strict economic sanctions programs imposed by the U.S. Government (the "U.S. Sanctions Regime"), A-45-46, ¶ 25, intended to prevent Hezbollah from accessing the international financial system and to reduce its ability to perpetrate terrorist attacks. A-46, ¶¶ 26-29. LCB, however, knowingly disregarded the U.S. Sanctions Regime with respect to Hezbollah. A-46, ¶¶ 31-32. Specifically, between 2003 and 2011, LCB knowingly provided extensive financial services to Hezbollah by, *inter alia*, holding accounts and conducting transfers and deposits totaling many millions of dollars for Hezbollah entities which comprise part of Hezbollah itself. A-47-49, ¶¶ 37-48.

## LCB's Hezbollah Customers

Between 2004 (or earlier) and July 2006 (and later), LCB maintained accounts for at least five Hezbollah entities and senior officials: Hezbollah fundraising entities Martyrs Foundation ("Shahid"), Bayt al-Mal and the Yousser Company for Finance and Investment ("Yousser"), and senior Hezbollah officials Husayn al-Shami and Wahid Mahmoud Sbeity (collectively, the "Five Customers"). A-47-48, ¶¶ 37-39.[3] LCB held at least five accounts for Shahid, at least two in the names of Bayt al-Mal, al-Shami, and Sbeity together, and at least five for Yousser.

Al-Shami is part of Hezbollah's political leadership and the other customers are vital parts of Hezbollah's network of social welfare organizations, which are integral to Hezbollah's terrorist apparatus. Hezbollah in Lebanon has been described as a "state within a state." A-87, ¶ 38. It raises funds from both legitimate and illicit businesses, social welfare organizations under its control, and donations from its

---

[3]  It also held one or more accounts for Nazem Ahmad, a senior Hezbollah operative designated an SDGT on December 13, 2019 as a "money launderer and significant Hezbollah financier." A-64, ¶ 97(a); A-98-99, ¶ 47(f); Press Release, U.S. Dep't of the Treasury, "Treasury Designates Prominent Lebanon and DRC-Based Hizballah Money Launderers" (Dec. 13, 2019), *available at* https://home.treasury.gov/news/press-releases/sm856.

supporters worldwide. A-89, ¶ 39. These subordinate social welfare organizations are integral, constituent parts of Hezbollah. A-43-44, ¶ 20.[4]

One of Hezbollah's "most important branch[es]" is Shahid. A-44-45, ¶ 22.[5] Shahid's role as part of Hezbollah's Social Services Section (which "serves as an equal arm within the organization and is used as much as the military and political wing in term of leverage") is to provide funding and social services to injured Hezbollah operatives and the families of deceased operatives who were killed in order to "provide peace of mind to current and prospective" operatives. *Id. See also Licci VI*, 834 F.3d at 208 (crediting Plaintiffs' allegations, supported by the Shaya Declaration, that Shahid "was integral to Hezbollah, and that it 'serves as an important component of [Hezbollah's] financial apparatus'").

Shahid was designated by the U.S. Treasury on July 24, 2007 for funding Hezbollah operatives and their family members, and because

---

[4]    The SAC relies on a report on Hezbollah prepared by the Congressional Research Service and an article authored by terrorism expert Dr. Matthew Levitt, who is cited in *Holder v. Humanitarian Law Project*, 561 U.S. 1, 30-31 (2010) on the links between charitable fronts and the terrorist organizations that control them.

[5]    The SAC relies on a publication from the U.S. Joint Special Operations University, an educational component of the Department of Defense, in support of this allegation.

"*senior Martyrs Foundation officials were directly involved in Hezbollah operations against Israel during the July-August 2006 conflict.*"[6] Treasury recently reiterated that, "[a]s noted in previous Treasury actions, the Lebanon office of the Martyrs Foundation acts as an Iranian parastatal organization and is *an integral element of Hizballah's global terror support network.*"[7]

Two other critical entities controlled by Hezbollah are Bayt al-Mal (translated as "House of Finance") and Yousser, each designated a Specially Designated Global Terrorist ("SDGT") by the U.S. Treasury on September 7, 2006. A-45, ¶ 23; A-96, ¶ 47(a). According to Treasury, Bayt al-Mal functioned as Hezbollah's unofficial treasury, serving as its bank, creditor, and investment arm. A-45, ¶¶ 23-24 (citing U.S. Treasury designation). Yousser was used by Bayt al-Mal to secure loans and

---

[6]     Press Release, U.S. Dep't of the Treasury, "Twin Treasury Actions Take Aim at Hizballah's Support Network" (July 24, 2007), *available at* https://www.treasury.gov/press-center/press-releases/Pages/hp503.aspx (emphasis added) (cited by A-101-02, ¶ 47(g)(7)).

[7]     Press Release, U.S. Dep't of the Treasury, "Treasury Designates Martyrs Foundation Companies and Officials as Global Terrorists" (Feb. 26, 2020), *available at* https://home.treasury.gov/news/press-releases/sm917" (emphasis added).

finance business deals for Hezbollah companies, and it also functioned as Hezbollah's unofficial treasury. *Id.*

Al-Shami was the head of Bayt al-Mal and a notorious Hezbollah leader who served as a member of Hezbollah's seven-member politburo (known as the Shura Council) and as the head of several Hezbollah-controlled organizations, including the Islamic Resistance Support Organization.[8] A-61, ¶ 81 (citing Treasury designations of Bayt al-Mal, Yousser, and Husayn al-Shami); A-96, ¶ 47(a). On September 7, 2006, the United States also designated al-Shami an SDGT for the conduct described herein. A-61 ¶ 81 n.9. Finally, Sbeity was a nominal owner of Yousser. A-100, ¶ 47(g)(3).

For years prior to July 12, 2006, Hezbollah openly, publicly, and repeatedly acknowledged on its official websites, in official press releases

---

[8] The Islamic Resistance Support Organization was designated by the U.S. Treasury on August 29, 2007 for its role as a "key Hezbollah fundraising organization." Treasury described in the designation how "IRSO makes no attempt to hide its true colors. IRSO's fundraising materials present donors with the option of sending funds to equip Hezbollah fighters or to purchase rockets that Hezbollah uses to target civilian populations." Press Release, U.S. Dep't of the Treasury, "Treasury Designates Key Hizballah Fundraising Organization" (Aug. 29, 2006), *available at* https://www.treasury.gov/press-center/press-releases/Pages/hp73.aspx.

it issued, on its official television station, on its official radio station, and in numerous press conferences and news media interviews conducted by its senior officials that Shahid, Bayt al-Mal and Yousser were integral constituent parts of Hezbollah. A-57, ¶ 78. Additionally, Shahid's role as an integral part of Hezbollah was publicized for many years prior to July 12, 2006 in a myriad of sources, including newspapers published and distributed in Lebanon and in Europe, and multiple BBC publications. A-57-60, ¶ 79. In fact, the Treasury Department recently described Shahid as "openly affiliated with Hezbollah."[9]

In addition to Shahid, Bayt al-Mal and Yousser openly identifying as components of Hezbollah throughout the relevant period, they also conducted their financial operations with LCB in a manner inconsistent with ordinary charitable or commercial purposes. For example, as early as 2003, LCB granted each of them special exemptions from submitting cash transaction slips ("CTSs") for reporting cash transactions over $10,000 as required by Lebanon's Central Bank. A-61, ¶ 82. Specifically,

---

[9]     *See* Press Release, U.S. Dep't of the Treasury, "Treasury Labels Bank Providing Financial Services to Hizballah as Specially Designated Global Terrorist" (Aug. 29, 2019), *available at* https://home.treasury. gov/news/press-releases/sm760 (emphasis added).

LCB bank officials granted Yousser an exemption from reporting $50,000 in cash per week at one LCB branch and up to $60,000 *per day* at another. A-100, ¶ 47(g)(1). LCB also exempted Shahid from reporting cash transactions up to *$100,000 per day*. A-101-02, ¶ 47(g)(7). Husayn al-Shami and Wahid Mahmoud Sbeity were exempted from reporting up to $30,000 in cash transactions per week at one LCB branch, and al-Shami was exempted from reporting up to *$200,000 in cash transactions per day* at another branch. A-100-01, ¶ 47(g)(3). LCB's knowledge of the criminal enterprise can be reasonably inferred from the fact that its nominally "charitable" and individual customers not only contemplated moving up to $200,000 in cash transactions *per day*, but also requested and received exemptions from reporting them to the Lebanese central bank.

Even after Yousser and al-Shami were designated SDGTs on September 7, 2006 (Yousser because of its role as "Hezbollah's unofficial treasury" and al-Shami because of his senior leadership role in Hezbollah and his position as head of Bayt al-Mal), LCB continued to maintain banking relationships with them, A-45, ¶¶ 23-24; A-64, ¶ 97(b); A-96, ¶ 47(a); A-102, ¶ 47(h), supporting the strong inference that the bank not only knew it was providing assistance to Hezbollah but continued to do

so willfully, in the face of risk of U.S. civil and criminal penalties following the designation of its customers.

## U.S. Government Actions Against LCB

On February 17, 2011, the U.S. Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") issued a finding and proposed rule, pursuant to section 311 of the USA PATRIOT Act, codified at 31 U.S.C. § 5318A, that LCB is a "financial institution of primary money laundering concern," based on, *inter alia*, FinCEN's determination that there was reason to believe that LCB had been routinely used by Hezbollah-controlled drug traffickers and money launderers operating in various countries in Central and South America, Europe, Africa, and the Middle East.[10] FinCEN also determined that there was reason to believe that LCB managers were complicit in Hezbollah's money laundering activities. A-65, ¶ 98; A-73-74, ¶ 6.

---

[10] The U.S. Government found that "Hezbollah members and supporters are involved at various points in the money laundering scheme," and described how "Hezbollah members and supporters facilitate the smuggling of cash, including proceeds from the sale of used cars exported from the United States and narcotics proceeds, from West Africa to Lebanon; and finance and facilitate the purchase of some of the used cars in the United States." A-71, ¶ 2.

On December 15, 2011, the U.S. Government brought a civil forfeiture action against LCB, alleging a widespread, international scheme in which the bank used the U.S. financial system to launder Hezbollah's narcotics trafficking and other criminal proceeds through West Africa and back into Lebanon. A-65, ¶ 98; A-71, ¶ 1. The U.S. Government also noted that LCB was aware that its customer, Nazem Ahmad (an SDGT), was identified in a 2002 UN report as having "ties to Hezbollah" and being "involved in counterfeiting, money-laundering and diamond smuggling" but dismissed the report "as part of the propaganda and war launched by the Jewish state against Lebanon." LCB then authorized an increase in credit limits for Ahmad. A-64, ¶ 97(a); A-98-99, ¶ 47(f). LCB continued to knowingly assist Hezbollah in laundering hundreds of millions of dollars through the aforementioned scheme until it ceased engaging in banking activity entirely in 2011. A-64, ¶ 97(c); A-73-75, ¶¶ 6-9. These financial services "enabled" and "facilitated" Hezbollah in firing thousands of rockets into northern Israel between July 12 and August 14, 2006. *Licci VI*, 834 F.3d at 218; A-49, ¶ 49.

# SUMMARY OF THE ARGUMENT

Section 2333(d) was created as part of the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. 114-222, 130 Stat. 852 (2016) to fill in gaps in the ATA identified by several courts. In *Boim v. Holy Land Found. for Relief and Dev.*, 549 F.3d 685, 689 (7th Cir. 2008), the court rejected secondary liability as an implied cause of action under the ATA's civil provision, 18 U.S.C. § 2333(a). The Second Circuit concurred in *Rothstein v. UBS AG*, 708 F.3d 82, 98 (2d Cir. 2013). Three years later, Congress enacted JASTA to expand and strengthen the ATA by creating an express cause of action for civil aiding and abetting and conspiracy. *Linde v. Arab Bank, PLC*, 882 F.3d 314, 328 (2d Cir. 2018) (describing JASTA as an "expansion" of the ATA).

Congress included a Findings and Purpose section in JASTA's statutory language, providing Congress's intent for the interpretation and enforcement of § 2333(d). 18 U.S.C. § 2333 Statutory Note (Findings and Purpose). Among other things, Congress made clear that JASTA was:

- Establishing *Halberstam* as "the proper legal framework" for how civil aiding and abetting and conspiracy "liability should function" in cases brought under the ATA, §2(a)(5);

- Enacted to target terror financing, *see* § 2(a)(3) ("Some foreign terrorist organizations, acting through affiliated groups or individuals, raise significant funds outside of the United States for conduct directed and targeted at the United States");

- Intended to reach "[p]ersons, entities, or countries that **knowingly or recklessly** contribute material support or resources, **directly or indirectly**, to persons or organizations that pose a significant risk of committing acts of terrorism that threaten the security of nationals of the United States or the national security, foreign policy, or economy of the United States …." § 2(a)(6) (emphasis added); and

- Intended to extend liability to "persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." § 2(b).

In contrast to its criminal counterpart, civil aiding and abetting premises liability on the foreseeability of a wrong, not the intent to cause it. As Judge Learned Hand famously observed in *United States v. Falcone* and *United States v. Peoni*, whereas a criminal aider and abettor or conspirator "must in some sense promote [the unlawful] venture himself, make it his own, have a stake in its outcome," a defendant's *civil* liability "extends to any injuries which he should have apprehended to be likely to follow from his acts." *Falcone*, 109 F.2d 579, 581 (2d Cir. 1940). *See*

*also Peoni*, 100 F.2d 401, 402 (2d Cir. 1938) (holding that criminal aiding and abetting requires evidence that the defendant "participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed," whereas civil aiding and abetting requires only that the wrong be "a natural consequence of [the aider's] original act"); *Rice v. Paladin Enterprises, Inc.*, 128 F.3d 233, 251 (4th Cir. 1997) ("As Judge Learned Hand explained in discussing generally the difference between civil and criminal aiding and abetting laws, the intent standard in the civil tort context requires only that the criminal conduct be the 'natural consequence of [one's] original act,' whereas criminal intent to aid and abet requires that the defendant have a 'purposive attitude' toward the commission of the offense.") (citing *Peoni*, 100 F.2d at 402).

This Court in *Linde* implicitly acknowledged Judge Learned Hand's distinction between civil and criminal aiding and abetting. Quoting *Peoni* through a 2014 Supreme Court decision, this Court held that general awareness does not require "the specific intent demanded for criminal aiding and abetting culpability, *i.e.*, defendant's intent to participate in a criminal scheme as 'something that he wishes to bring about and seek by his action to make it succeed.'" *Linde*, 882 F.3d at 329 (quoting *Rosemond*

*v. United States*, 572 U.S. 65, 76 (2014) (quoting *Peoni*, 100 F.2d at 402)). Thus, while evidence of a civil aider's intent can obviously bolster the inference of general awareness required under *Halberstam*, it is not required. *See id.* at 329 n.10.

Forty years after *Falcone*, the D.C. Circuit's opinion in *Halberstam* articulated the elements required to establish civil aiding and abetting under § 2333(d): (1) the party the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time he provides the assistance; and (3) the defendant must knowingly and substantially assist the principal violation. *Linde*, 882 F.3d at 329 (quoting *Halberstam*, 705 F.2d at 487-88). Consistent with Judge Learned Hand's observation in *Peoni*, in *Halberstam* a civil aider and abettor was found liable for "a natural and foreseeable consequence of the activity" she helped the principal tortfeasor undertake, even though she had no knowledge of those consequences. 705 F.2d at 488. And as the SAC shows, relying on U.S. Government findings, services for the Hezbollah entities and leaders at issue *foreseeably* increase the capacity for Hezbollah's terrorist attacks.

By adopting *Halberstam* as the "proper legal framework" for claims brought under the ATA, Congress was affirming its intent that the class of secondary tortfeasors who could be held civilly liable under § 2333(d) included defendants whose own conduct was not itself violent or dangerous to human life and who did not specifically intend violence to occur as a result of their tortious conduct. In *Halberstam*, the defendant, Linda Hamilton, was found civilly liable for aiding and abetting the murder of Michael Halberstam by her boyfriend, Bernard Welch, while he was escaping a botched burglary. *See* 705 F.2d at 474 ("[Ms. Hamilton is] civilly liable, as a joint venturer ... for the killing of Michael Halberstam"). However, Hamilton, who assisted what she claimed was her boyfriend's antiques business, did not know about the murder—or even the burglary:

> It was not necessary that Hamilton knew specifically that Welch was committing burglaries. Rather, when she assisted him, it was enough that she knew he was involved in some type of personal property crime at night—whether as a fence, burglar, or armed robber made no difference—because violence and killing is a foreseeable risk in any of these enterprises.

*Id.* at 488.

Hamilton provided bookkeeping and banking services for her boyfriend, which "acts were neutral standing alone." *Id.* However, the court reasoned that Hamilton's knowledge of her boyfriend's "criminal doings" could be inferred from the fact that she knew "something illegal was afoot." *Id.* at 486. Thus, even though Hamilton could not have had foreknowledge of an unplanned murder (let alone an intent to commit murder), she "had a general awareness of her role in a continuing criminal enterprise." *Id.* at 488.

In the face of multiple U.S. Government findings, the District Court here nonetheless held that the SAC did not plausibly allege that Hezbollah received any funds from LCB and that it was implausible that LCB knew that Hezbollah would receive funds from LCB accounts that were directly controlled by Hezbollah, openly and notoriously belonged to Hezbollah, and in some cases were managed by a senior Hezbollah leader. Moreover, although acknowledging that *Halberstam*'s civil aiding and abetting framework applied, the District Court nonetheless disregarded that framework in evaluating the well-pleaded allegations in the SAC by imposing a specific intent requirement found in neither *Halberstam* nor the statute's plain language.

# ARGUMENT

18 U.S.C. § 2333(d)(2) provides:

> In an action under subsection (a) for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189), as of the date on which such act of international terrorism was committed, planned, or authorized, liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism.

It is not disputed that Hezbollah committed, planned or authorized the rocket attacks in 2006 at issue, which constituted acts of international terrorism under § 2333(a) and § 2331(1), or that Hezbollah was designated an FTO at that time. As shown below, however, the District Court erroneously found that Plaintiffs failed to allege that LCB "aid[ed] and abet[ted], by providing substantial assistance, ... the person who committed such an act of international terrorism." § 2333(d)(2).

## I. The District Court Erroneously Held That the SAC Failed to Plausibly Allege That LCB Provided "Funds" to Hezbollah.

The District Court held that "although Plaintiffs assert that Defendant processed millions of dollars' worth of wire transfers through the LCB Accounts, Plaintiffs do not plausibly allege that Hezbollah received any of those funds or that Defendant knew or intended that

26

Hezbollah would receive the funds." A-190. As this Court has noted, the test under *Iqbal* is only whether the complaint is *plausible*, rather than just "a sheer possibility," even if it were less plausible than an alternative explanation. *Palin*, 940 F.3d at 810. To find it *implausible* that "Hezbollah received any … funds" from the LCB accounts specifically identified in the SAC, a court would have to conclude that the U.S. Treasury Department's stated reasons for designating Shahid, Bayt al-Mal and Yousser were either false or themselves facially implausible.

As noted above, Shahid was designated on July 24, 2007 for funding Hezbollah operatives and their family members, and also because "senior Martyrs Foundation officials were directly involved in Hezbollah operations against Israel during the July-August 2006 conflict." *Supra* at 13-14. As also noted above, Bayt al-Mal and Yousser were both designated on September 7, 2006 (less than one month after the rocket barrage ended) and identified as Hezbollah's unofficial treasury. *Supra* at 14-15. While it is theoretically *possible* that the Treasury Department was misinformed when it described Shahid as "openly affiliated with Hezbollah" and that Hezbollah lied when it openly, publicly, and repeatedly acknowledged Shahid, Bayt al-Mal and Yousser as its

integral, constituent parts, the SAC's allegations that Hezbollah received funds from LCB accounts maintained for these organizations are, at a minimum, plausible.

## II. The District Court Erroneously Held That the SAC Failed to Plausibly Allege That LCB Knew That Its Customers Were Affiliated with Hezbollah.

The District Court erroneously held that the SAC failed to state a claim because it did not plausibly allege that LCB "knew or intended that Hezbollah would receive the funds." A-190. Intent is not required under JASTA, and Plaintiffs plausibly alleged LCB's knowledge that the Five Customers were conduits for Hezbollah.

### A. The District Court Discounted Prior Second Circuit Precedent.

This Court in *Licci VI*, analyzing less robust allegations than those set forth in the SAC,[11] found the complaint in that case had plausibly pleaded that:

---

[11] *Licci IV* and *VI* relied on Plaintiffs' First Amended Complaint, which contained less robust allegations than did the SAC. The SAC (i) incorporates by reference and includes allegations from the VAC; (ii) adds new LCB account information for Shahid; (iii) introduces allegations regarding LCB's financial services for Bayt al-Mal and Yousser, as well as Hezbollah leaders Husayn al-Shami and Wahid Mahmoud Sbeity; and (iv) relies on the 2011 Treasury designation of LCB as a "primary money laundering concern" due to its extensive involvement with and support

LCB had actual knowledge that (1) [Hezbollah] is a violent terrorist organization [that] carried out numerous terrorist attacks against Israeli civilians and American targets and which planned and intended to carry out additional such terrorist attacks; (2) Shahid is an integral part of [Hezbollah] and constitutes part of [Hezbollah's] financial arm; (3) Hezbollah's bank accounts at various LCB branches and the funds therein were owned and controlled by [Hezbollah]; (4) the wire transfers made and received by Hezbollah leading up to the 2006 rocket attacks were being carried out by and at the direction of [Hezbollah]; and (5) Hezbollah require[d] wire transfer services ... in order to plan, to prepare for and to carry out terrorist attacks.

834 F.3d at 218-19 (internal citations and quotation marks omitted).

Moreover, the Second Circuit applied the *higher* mental standard applicable in this Circuit to aiding and abetting claims under the ATS. While JASTA only requires "general awareness" of one's role in the underlying tortious conduct, the "*mens rea* standard for accessorial liability in ATS actions is purpose rather than knowledge alone." *Id.* at 217 (citing *Mastafa v. Chevron Corp.*, 770 F.3d 170, 193 (2d Cir. 2014) and *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 259 (2d Cir. 2009), *cert. denied*, 562 U.S. 946 (2010)). *See also Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 34-38 (D.C. Cir. 2011) (noting that in

for Hezbollah. This Court's prior findings are therefore bolstered by the SAC's additional allegations.

*Presbyterian Church of Sudan*, the Second Circuit adopted a higher *mens rea* standard for the ATS than the *mens rea* standard set forth in *Halberstam*), *vac'd on other grounds*, 527 F. App'x 7 (D.C. Cir. 2013).

This Court also cited (1) a declaration by former Israeli intelligence officer Uzi Shaya submitted by Plaintiffs, *Licci VI*, 834 F.3d at 207, 219; (2) the allegations in the civil forfeiture action that LCB engaged in activity "intended to conceal and disguise the true source, nature, ownership, and control" of proceeds of illegal activities in a scheme that "benefitted [Hezbollah]"; and (3) the Treasury's designation of LCB as "a financial institution of primary money laundering concern" as evidence which "provides context to" and "reinforce many of Plaintiffs' allegations against LCB." *Id.* at 208-09, 219.[12]

In the decision currently on appeal, the District Court distinguished *Licci VI* solely on the basis that it relates to the ATS claim alleging that LCB aided and abetted Hezbollah's violation of the law of nations under customary international law. A-191-92, n.6. But, as discussed above, *Licci VI* found the same allegations present here sufficient to plead aiding

---

[12]     The ATS claim was dismissed because this Court's prior holding in *Kiobel*, 621 F.3d 111, precluded ATS actions against corporate defendants. *Licci VI*, 834 F.3d at 219-20.

and abetting under a more demanding legal standard than required by § 2333(d)(2).

**B.    The District Court Improperly Applied a Heightened Pleading Standard to Plaintiffs' Scienter Allegations.**

Courts are expected to be "lenient in allowing scienter issues …. [t]o survive motions to dismiss." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 693 (2d Cir. 2009) (internal citation and quotation marks omitted). Yet, even under Fed. R. Civ. P. 8's lenient pleading standard, the District Court held that LCB's state of mind could not plausibly be inferred from "[t]he fact that Shahid, Bayt al-Mal and Yousser were integral constituent parts of Hezbollah was openly, publicly and repeatedly acknowledged and publicized by Hezbollah during the several year period prior [to] July 12, 2006" because there was no allegation that LCB actually "read or was aware of" any of the sources listed by the SAC publicizing Hezbollah's relationship to the Five Customers, including newspapers published and distributed in Lebanon and in Europe, and multiple BBC publications. A-189 (citing A-57-60, ¶¶ 78-79).

The District Court also disregarded Plaintiffs' allegations, supported by the VAC, that Hezbollah operates openly in Lebanon and

functions as a state within a state, A-43-44, ¶ 20; A-87, ¶ 38, and that its Martyrs Foundation is "openly affiliated with Hezbollah" — as the Treasury Department has found. The District Court acknowledged that the SAC cited, for example, prior statements that Shahid was the "most important branch of the Hezbollah organization" in its role as "part of Hezbollah's Social Services Section," that "serves as an equal arm within the organization and is used as much as the military and political wing in terms of leverage," but discounted the information because the cited *source materials* were published after the attacks at issue. A-189 (citing A-1 44, ¶ 22 n.5). It does not follow from the *date* of a report or government designation that the facts described therein were not knowable or known beforehand. U.S. Government designations, for example, are intrinsically retrospective as persons and entities cannot be designated for *future* conduct.

Thus, while the District Court acknowledged that "the U.S. Treasury's analysis and the complaint in the forfeiture action include damning allegations that Defendant was involved in a money laundering

scheme with links to Hezbollah,"[13] it discounted this "Treasury analysis" because it was issued after the rocket attacks at issue. A-190-91. It similarly held that Plaintiffs failed to allege LCB's "general awareness" because "none of the Five Customers were designated by the United States – prior to the rocket attacks in July and August 2006 – as having an affiliation with Hezbollah." A-189.

While it is theoretically *possible* that LCB lacked all knowledge of its notorious customers before they were designated, it is certainly not the most—let alone *only*—plausible inference that can be drawn from the SAC's allegations. Moreover, Plaintiffs are not required to prove at the pleading stage that any given LCB bank officer "read or was aware of" public information linking LCB's customers to Hezbollah. Considering the fact that Hezbollah operates openly in Lebanon (and did so during the relevant period), actively participates in the Lebanese political system (arguably controlling it), its senior leaders are public figures and its social welfare institutions are used to cement its public support, the

_____

[13] That "Treasury analysis" included identifying Bayt al-Mal and Yousser as "Hezbollah's unofficial treasury, holding and investing its assets and serving as intermediaries between the terrorist group and mainstream banks," and Husayn al-Shami as "a senior Hezbollah leader who has served as a member of Hezbollah's Shura Council."

SAC's allegations clearly cross "the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

Furthermore, apart from wholly discounting allegations that entities like Shahid have always openly identified with Hezbollah, the District Court did not even address the SAC's detailed allegations (predicated on U.S. Government findings) that LCB knowingly facilitated Hezbollah's financing by implementing highly atypical and suspicious policies for Hezbollah-affiliated customers as early as 2003. While there may *conceivably* be a benign explanation for allowing a purportedly "charitable" organization "openly affiliated with Hezbollah" like Shahid a cash reporting exemption of up to $100,000 *per day* at a single branch, A-101-02, ¶ 47(g)(7), or exempting a member of Hezbollah's Shura Council from reporting up to $200,000 in cash transactions *per day* at another branch, A-100-01, ¶ 47(g)(3), the SAC (and the U.S. Government's civil forfeiture complaint) plausibly alleged that these "accommodations" evince LCB's knowing facilitation of the illicit financing of Hezbollah.

## C. The District Court Ignored Plausible Inferences Drawn From LCB's Conduct After the Attacks.

The District Court also disregarded Plaintiffs' allegations that LCB continued to provide financial services to Yousser and al-Shami after the implicated attacks and even *after* they was designated by the U.S. Treasury as SDGTs because of their respective roles as "Hezbollah's unofficial treasury" and senior Hezbollah leader. A-64, ¶ 97(b); A-102, ¶ 47(h). As the Fifth Circuit explained in upholding criminal convictions under the ATA:

> But perhaps the strongest evidence that the defendants provided support to Hamas after Hamas was designated as a terrorist organization came through testimony and financial documents showing that HLF provided funds to the same Hamas-controlled zakat committees that it had supported before the designation.

*United States v. El-Mezain*, 664 F.3d 467, 489 (5th Cir. 2011).

Furthermore, these were not the only persons that LCB continued maintaining banking relationships with even after receiving warnings of their connections to Hezbollah. As noted above, LCB also dismissed a 2002 UN report flagging LCB's banking relationship with Nazem Ahmad. The UN report warned that Ahmad "had ties to Hezbollah" and was also "involved in counterfeiting, money-laundering and diamond

smuggling." An LCB customer due diligence report was also issued on Ahmad. Yet, the LCB credit department dismissed both, stating that "we consider such allegation as part of the propaganda and war launched by the Jewish state against Lebanon." LCB then authorized an *increase* in credit limits for Ahmad. A-64, ¶ 97(a); A-98-99, ¶ 47(f).

## III. The District Court Erroneously Held That the SAC Failed to Plausibly Allege That LCB Was Generally Aware of Its Role in Hezbollah's Criminal Enterprise.

As noted above, Congress intended § 2333(d) liability to reach those who "knowingly or recklessly contribute material support or resources," § 2(a)(6), and instructed that the "proper legal framework for how [aiding and abetting] liability should function" under the ATA is "[t]he decision of the United States Court of Appeals for the District of Columbia in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), which has been widely recognized as the leading case regarding Federal civil aiding and abetting and conspiracy liability, including by the Supreme Court of the United States." § 2(a)(5). The *Halberstam* court set forth "the elements of traditional tort theory that permit holding a nonparticipant in a burglary that led to murder civilly responsible for the economic consequences of so terrible an injury." 705 F.2d at 489. *See supra* at 23.

As explained above, in *Halberstam*, Hamilton was found civilly liable for aiding and abetting her boyfriend's murder of Michael Halberstam during a botched burglary.[14] And while Hamilton did not know about the murder or (purportedly) even the burglaries, the court found that "it was enough that she knew he was involved in some type of personal property crime at night—whether as a fence, burglar, or armed robber made no difference—because violence and killing is a foreseeable risk in any of these enterprises." *Id.* at 488. The court further concluded that because she "knew about and acted to support Welch's illicit enterprise," she "had a general awareness of her role in a continuing criminal enterprise." *Id.*

The District Court here, however, held that "[e]ven assuming, *arguendo*, that Defendant knew or should have known prior to the attacks about the Five Customers' relationships with Hezbollah, failure to perform due diligence on clients or to adhere to sanctions and counter-terrorism laws do not, on their own, equate to knowingly playing a role in terrorist activities." A-189. That phrasing echoes this Circuit's

---

[14]     Notably, *Halberstam* is an appellate case reviewing a *full* trial record, not a motion to dismiss.

description in *Linde* of *Halberstam*'s "general awareness" standard as requiring the secondary actor "to be 'aware' that, by assisting the principal, it is itself assuming a 'role' in terrorist activities." 882 F.3d at 329. However, the District Court appears to have construed *Halberstam*'s "general awareness" standard as requiring the secondary actor to know his *own* conduct involves violent acts of terrorism beyond violence being merely foreseeable, which is the sole scienter requirement in *Halberstam*. Construing "general awareness" in such a manner is inconsistent with the statute's Findings and the facts and holding of *Halberstam*.

Since § 2333(d)(2) addresses accessorial liability for terrorism, the phrase "terrorist activities" in *Linde* is synonymous with *Halberstam*'s description of a defendant's general awareness of a role in "an overall illegal or tortious activity." In *Halberstam*, the "overall illegal or tortious activity" was a criminal enterprise to traffic in stolen goods, not murder, and under § 2333(d)(2) "terrorist activities" means conduct relating to a terrorist enterprise, not specific terrorist attacks or rockets launched. It is this terrorist enterprise, like the personal property crimes at night, from which "violence and killing is a foreseeable risk." 705 F.2d at 488.

Thus, it was sufficient here that the SAC plausibly pleaded that LCB knowingly provided substantial assistance to Hezbollah – as § 2333(d)(2) states.

In certain rare circumstances, a defendant may know that it is assisting a terrorist organization but not realize that terror attacks are a foreseeable consequence of its assistance. *Linde* provided such an example, citing *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010). *Linde*, 882 F.3d at 330. In *Holder*, a variety of not-for-profit organizations sued the government, challenging the constitutionality of 18 U.S.C. § 2339B as applied to their proposed activities which included "(1) train[ing] members of [the FTO] PKK on how to use humanitarian and international law to peacefully resolve disputes; (2) engag[ing] in political advocacy on behalf of Kurds who live in Turkey; and (3) teach[ing] PKK members how to petition various representative bodies such as the United Nations for relief." 561 U.S. at 14-15 (internal citations and quotations marks omitted).

The Supreme Court upheld the constitutionality of § 2339B even given the plaintiffs' "seemingly benign support" for the PKK because it

"deferred" to the Executive Branch's and Congress's findings that "all contributions to foreign terrorist organizations further their terrorism":

> In the Executive's view: "Given the purposes, organizational structure, and clandestine nature of foreign terrorist organizations, it is highly likely that any material support to these organizations will ultimately inure to the benefit of their criminal, terrorist functions—regardless of whether such support was ostensibly intended to support non-violent, non-terrorist activities.

561 U.S. at 33–34, 36.

*Linde* alludes to the possibility that the § 2339B violations described in *Holder*, evidently intended to make PKK *less* violent, would raise a jury question as to whether those material support violations alone, without more, would establish general awareness of a role in an FTO's terrorist activities such that acts of terrorism would be a foreseeable consequence of that conduct.[15]

---

[15]  Such knowing violations of § 2339B may still, nonetheless, suffice as a pleading matter; for instance, the defendants in *Holder* were "lend[ing] legitimacy to foreign terrorist groups—legitimacy that makes it easier for those groups to persist, to recruit members, and to raise funds—all of which facilitate more terrorist attacks," and also because "[m]oney is fungible, and … funds raised ostensibly for charitable purposes have in the past been redirected by some terrorist groups to fund the purchase of arms and explosives." *Id.* at 30-31 (internal citations and quotations marks omitted).

On the other hand, contrary to the District Court's gloss, in the terrorism context a defendant's general awareness of a role in "an overall illegal or tortious activity" does *not* mean a role in specifically financing rocket attacks or violence of any kind, nor does it require pleading that LCB "knew of the specific attacks at issue when it provided financial services." *Linde*, 882 F.3d at 329.

The touchstone of scienter for civil aiding and abetting is foreseeability. Hence, *Halberstam* analyzed *American Family Mutual Insurance Co. v. Grim*, 440 P.2d 621 (Kan. 1968) where "the acts of the person assisted … were not specifically contemplated by the defendant at the time he offered aid." *Id.* at 483, 488-89. In *Grim*, four 13- and 14-year-old boys attempted to steal sodas from their neighborhood church. 440 P.2d at 622. The doors to the church's kitchen were locked, so two of the boys – not including the defendant – tried to gain entry to it through the attic. For light, those boys rolled up paper material which they lit with matches. They were unsuccessful in accessing the kitchen, and the four boys left the church after three of them – not including the defendant – extinguished the makeshift torches. *Id.* at 623. The boys did not completely extinguish the torches, however, and the church caught fire.

*Id.* After paying for the damage to the church, the plaintiff insurance company sued the defendant. *Id.* at 622.

The defendant argued that he "had nothing to do with the use of the torches, nor did he know they were being used." *Id.* at 625. But, as *Halberstam* noted, the *Grim* court concluded that the "need for adequate lighting could reasonably be anticipated [and] torches served that purpose. Thus, the boy who had not used a torch, nor even expected one to be lighted, could be liable for the damage caused by the torches because their employment was foreseeable." *Halberstam*, 705 F.2d at 483 (citing *Grim*, 440 P.2d at 626) (internal citations omitted).

Here, LCB is plausibly alleged to have knowingly provided substantial assistance to multiple Hezbollah entities and senior leaders. The SAC further alleged – supported by U.S. Government findings – that LCB provided several of these Hezbollah customers with extraordinary freedom to deposit and transfer enormous sums of cash without having to report these transactions to Lebanese authorities (as required by law). Hezbollah's greatly increased ability to fund and perpetrate acts of terrorism could "reasonably be anticipated" as a result of this conduct, and while LCB is not alleged to have participated in launching rockets or

to have known specifically about Hezbollah's use of rockets (JASTA and *Halberstam* requiring neither allegation), "their employment was foreseeable." *Halberstam*, 705 F.2d at 483.

## IV. Plaintiffs Have Plausibly Alleged That LCB Knowingly Provided Substantial Assistance to Hezbollah.

Plaintiffs have plausibly alleged that LCB "knowingly provided substantial assistance" to Hezbollah during the relevant period. § 2333(d)(2). *Halberstam* identified six factors to assess substantiality: (1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance. *Halberstam*, 705 F.2d at 483-84. In *Linde*, relying on a full trial record, the Second Circuit explained that "[d]isputed facts pertinent to these factors and the weight to assign such facts" are factual issues for the trier of fact and not matters that can be determined as a matter of law. *Linde*, 882 F.3d at 330. This is even truer at the motion to dismiss stage.

Plaintiffs have sufficiently alleged LCB's substantial assistance here:

*The Nature of the Act Assisted.* The nature of the act involved "dictates what aid might matter, *i.e.*, be substantial." *Halberstam*, 705 F.2d at 484. Just as Hamilton's services were "indisputably important to th[e] laundering function" of her boyfriend's burglary enterprise, *id.* at 488, this Court already found that LCB's financial services were vital to Hezbollah's terror financing when it concluded that "LCB's alleged act of carrying out wire transfer services on Hezbollah's behalf through the state of New York, satisfies a preliminary determination that such conduct provided practical assistance to Hezbollah that substantially affected Hezbollah's perpetration of the underlying violations of the law of nations. Plaintiffs adequately allege that these wire transfer services had a substantial effect on Hezbollah's actions insofar as they enabled and facilitated terrorist rocket attacks harming or killing Plaintiffs and their decedents." *Licci VI*, 834 F.3d at 218 (internal citations and quotation marks omitted). Notwithstanding the District Court's discounting of this finding, it is clearly correct.

*Halberstam* also noted that "the blameworthiness of the tortious act or the seriousness of the foreseeable consequences" could be considered in the "nature of the act" and "state of mind" factors. 705 F.2d

at 484 n.13. Unlike the criminal enterprise in *Halberstam* — trafficking in stolen goods — the criminal enterprise alleged here is assisting the financing of a terrorist organization, and the foreseeable consequences of that conduct were inarguably more likely to result in violence than Welch's "property crimes at night."

***Amount of Assistance.*** This Court in *Licci IV* credited Plaintiffs' allegations regarding LCB's "wire transfers through AmEx that numbered in the dozens and totaled several million dollars, so it cannot be said that LCB's contacts with New York were random, isolated, or fortuitous." *Licci IV*, 732 F.3d at 171 (internal citations and quotation marks omitted). As discussed above, the District Court held, however, that while "Plaintiffs assert that Defendant processed millions of dollars' worth of wire transfers through the LCB accounts," they "do not plausibly allege that Hezbollah received any of those funds." A-190. But the District Court was silent about the fact that the Five Customers were either *components*, or senior leaders, of Hezbollah.

To the extent the District Court was suggesting that a defendant can only be liable if it provides substantial assistance to an FTO by directing that support to the organization *by name*, that reading of the

statute should not be credited. As the D.C. Circuit Court of Appeals noted:

> Just as it is silly to suppose "that Congress empowered the Secretary to designate a terrorist organization . . . only for such periods of time as it took such organization to give itself a new name, and then let it happily resume the same status it would have enjoyed had it never been designated,". . . so too it is implausible to think that Congress permitted the Secretary to designate an FTO to cut off its support in and from the United States, but did not authorize the Secretary to prevent that FTO from marshaling all the same support via juridically separate agents subject to its control.

*National Council of Resistance of Iran v. Dep't of State*, 373 F.3d 152, 157-58 (D.C. Cir. 2004) (citations omitted). The court asserted that such a "crabbed view of alias status" "is at war not only with the antiterrorism objective of AEDPA [Anti-Terrorism and Effective Death Penalty Act of 1996], but common sense as well." *Id.* at 158.

Similarly, as noted above, the Fifth Circuit upheld the criminal convictions under 18 U.S.C. § 2339B of donors to so-called charities controlled by Hamas, not to Hamas in its own name. *El-Mezain*, 664 F.3d at 489 ("The evidence of Hamas control of the zakat committees was substantial."). Moreover, JASTA's stated purpose is to "provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities,

and foreign countries, wherever acting and wherever they may be found, that have provided material support, *directly or indirectly*, to foreign organizations or persons that engage in terrorist activities against the United States." JASTA, § 2(b).

In addition, § 2333(d) provides its own expansive definition of the term "person" which goes beyond the FTO itself, including "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 1 U.S.C. § 1.

**Presence at the time of the tort.** In *Halberstam*, "Hamilton was admittedly not *present at the time* of the murder or even at the time of any burglary," but "the success of the tortious enterprise clearly required expeditious and unsuspicious disposal of the goods, and Hamilton's role in that side of the business was substantial." 705 F.2d at 488. LCB was not "present at the scene" of the rocket attacks, but the SAC plausibly alleged that the success of Hezbollah's tortious enterprise required banking services and that LCB's role in funding Hezbollah's terror operations was substantial.

**State of Mind.** The *Halberstam* court held that "evidence as to the state of mind of the defendant may also be relevant to evaluating

liability." 705 F.2d at 484. *See also Linde*, 882 F.3d at 329 n.10. The *Halberstam* court found the state of mind factor satisfied based on the district court's "inference of knowing" assistance. 705 F.2d at 487-88. This "inference of knowing" assistance was based on Hamilton's "invaluable service to the enterprise as banker, bookkeeper, recordkeeper, and secretary," which services she performed "in an unusual way under unusual circumstances for a long period of time and thereby helped launder the loot and divert attention from Welch." *Id.* The D.C. Court of Appeals then extrapolated that these unusual and prolonged actions "evidence[] a deliberate long-term intention to participate in an ongoing illicit enterprise," as opposed to a "passing fancy or impetuous act." *Id.* at 488.

Here, LCB maintained accounts for the Five Customers since at least 2004 (and in some cases earlier) and granted these accountholders extraordinary exemptions from standard cash reporting requirements, A-61, ¶ 82; A-99-102, ¶¶ 47(g)(1)-(7). Many of those accounts, including those for Shahid and Yousser, were allegedly still active at LCB in 2011, four and five years, respectively, after the organizations were designated as SDGTs. As stated above, when a 2002 UN report identified Nazim

Ahmad as having "ties to Hezbollah" and being involved in counterfeiting, money-laundering and diamond smuggling, LCB officials rejected this information as "part of the propaganda and war launched by the Jewish state against Lebanon," and authorized an *increase* in credit limits for the suspected customer. A-64, ¶ 97(a); A98-99, ¶ 47(f). Ahmad was later designated as an SDGT and described by Treasury as a "significant Hezbollah financier."[16]

Treasury also found that "LCB managers are linked to Hezbollah officials outside Lebanon. For example, Hezbollah's Tehran-based envoy Abdallah Safieddine is involved in Iranian officials' access to LCB and key LCB managers, who provide them banking services." A-149.

The SAC's allegations of LCB's knowing substantial assistance are also affirmed by the sworn declaration of former Israeli intelligence officer Uzi Shaya. As this Court noted in *Licci VI*, Shaya declared that leading up to and following the July 2006 attacks, Hezbollah made "dozens" of wire transfers from one Shahid account at LCB in Lebanon,

---

[16]    *See* Press Release, U.S. Dep't of the Treasury, "Treasury Designates Prominent Lebanon and DRC-Based Hizballah Money Launderers" (Dec. 13, 2019), *available at* https://home.treasury.gov/news/press-releases/sm856.

"total[ing] several million dollars," and that the millions of dollars of wire transfers LCB processed for Hezbollah significantly enhanced Hezbollah's "ability to plan and carry out ... the rocket attacks" that injured Plaintiffs. 834 F.3d at 208 (internal citations omitted).

The U.S. Government also determined that between approximately January 2007 and early 2011, LCB knowingly assisted Hezbollah in laundering hundreds of millions of dollars through a complex narcotics trafficking scheme. A-64, ¶ 97(c); A-75, ¶ 9. Although subsequent to the rocket attacks at issue, this conduct, which compelled the Treasury to take the severe step of finding LCB a "financial institution of primary money laundering concern" under section 311 of the USA PATRIOT Act, gives rise to the plausible inference that LCB was deeply involved in assisting Hezbollah over a long period of time.

*Duration of the Assistance.* The SAC alleged that LCB maintained accounts for the Five Customers for a period of at least two years prior to the rocket attacks at issue, A-47, ¶¶ 37-39, during which time it provided several of these Hezbollah customers with extraordinary freedom to deposit and transfer enormous sums of cash without having to report

these transactions to Lebanese authorities (as required by law). A-61, ¶ 82; A-99-102, ¶¶ 47(g)(1)-(7).

As this Court noted, the U.S. Government's civil forfeiture action against LCB "lends support to Plaintiffs' allegations," particularly its conclusion that "LCB engaged in activity 'intended to conceal and disguise the true source, nature, ownership, and control of' proceeds of illegal activities in a scheme that 'benefitted [Hezbollah].'" 834 F.3d at 219 (citations omitted). At a minimum, the SAC's allegations — citing U.S. Government findings — provide a plausible inference that LCB's conduct constituted "a deliberate long-term intention to participate in an ongoing illicit enterprise." *Halberstam*, 705 F.2d at 488.

The District Court's requirement that Defendant "knowingly and intentionally supported Hezbollah in perpetrating the rocket attacks," A-190, echoes its observation that Plaintiffs never alleged that "any funds transferred through the LCB Accounts were, in fact, sent to Hezbollah *and then used by Hezbollah to perpetrate the rocket attacks*," A-185-86 (emphasis added). Courts interpreting the ATA have consistently rejected the requirement that a bank's financial services be directly used in, and traced to, the attacks at issue, given the fungibility of money.

As the Supreme Court explained, Congress and the Executive Branch rejected any legal distinction between an FTO's violent, political and social welfare or religious activities, because "money is fungible" and FTOs "do not maintain legitimate *financial* firewalls between those funds raised for civil, nonviolent activities, and those ultimately used to support violent, terrorist operations. Thus, funds raised ostensibly for charitable purposes have in the past been redirected by some terrorist groups to fund the purchase of arms and explosives." *Holder*, 561 U.S. at 31 (emphasis in original) (internal citations and quotation marks omitted).

Lower courts have also repeatedly rejected a requirement that plaintiffs trace transactions to specific attacks. For instance:

> Common sense requires a conclusion that Congress did not intend to limit recovery to those plaintiffs who could show that the *very dollars* sent to a terrorist organization were used to purchase the implements of violence that caused harm to the plaintiff. Such a burden would render the statute powerless to stop the flow of money to international terrorists, and would be incompatible with the legislative history of the ATA.

*Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 429 (E.D.N.Y. 2009). *See also Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 507 (E.D.N.Y. 2012) ("A contribution, if not used directly, arguably would be used indirectly by substituting it for money in Hamas' treasury; money transferred by

Hamas' political wing in place of the donation could be used to buy bullets."); *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 323 (E.D.N.Y. 2015), *vac'd on other grounds*, 882 F.3d 314 (2d Cir. 2018) (rejecting "defendant's argument that plaintiffs were required to trace specific dollars to specific terrorist attacks").

This "common sense" proposition is reflected in JASTA's stated purpose "to provide civil litigants with the broadest possible basis … to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." JASTA § 2(b).

## V. The District Court Erroneously Required Plaintiffs to Plead That LCB Provided Substantial Assistance to Perpetrate the Rocket Attacks.

Although the District Court explicitly acknowledged that a claim under § 2333(d)(2) does not require pleading defendant's "knowledge of the particular attacks at issue," A-188 (citing *Linde*, 882 F.3d at 329), it nonetheless found the SAC deficient for failing to link LCB's conduct directly to the rocket attacks that injured Plaintiffs. First, it held that "Plaintiffs fail to plausibly allege that Defendant, when processing the

wire transfers, conspired with or aided and abetted Hezbollah in perpetrating the rocket attacks." A-187. It also found that "Plaintiffs do not advance any factual, non-conclusory allegations that Defendant knowingly and intentionally supported Hezbollah in perpetrating the rocket attacks." A-190.

While the SAC was required to plausibly plead that rocket attacks were a *foreseeable consequence* of LCB's substantial assistance to Hezbollah, civil aiding and abetting does not require a specific intent to cause the harm that injured the plaintiffs. *See Linde*, 882 F.3d at 329. In *Halberstam,* Hamilton had no knowledge of the murder of Dr. Halberstam, and her boyfriend Welch did not set out that night to murder him – it was an *unplanned* murder during Welch's attempt to escape the scene when Dr. Halberstam unexpectedly arrived. Likewise, none of the teenagers in *Grim* intended to start a fire, but even the defendant – who did not even know about the use of torches – was found liable for the foreseeable consequences of the criminal enterprise.

As discussed above, it was therefore clear and reversible error for the District Court to impose a "knowing and intentional" scienter standard to claims brought under § 2333(d)(2), and it was also clear and

reversible error to require a showing that LCB knowingly and intentionally supported Hezbollah "*in perpetrating the rocket attacks.*"

## CONCLUSION

For the reasons stated above, this Court should vacate the District Court's dismissal and return the case for discovery.

Respectfully submitted,

/s/ Gary M. Osen

**OSEN LLC**
Gary M. Osen
 *Counsel of Record*
Ari Ungar
Michael Radine
Dina Gielchinsky
Aaron A. Schlanger
2 University Plaza, Suite 402
Hackensack, New Jersey 07601
(201) 265-6400

*Appellate Counsel for Plaintiffs-Appellants*

THE BERKMAN LAW OFFICE, LLC
Robert J. Tolchin
111 Livingston Street
Brooklyn, New York 11201
(718) 855-3627

*Attorneys for Plaintiffs-Appellants*

# CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,011 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century.

Dated: February 27, 2020

/s/ Aaron A. Schlanger
*Attorney for Plaintiffs-Appellants*